THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| DONALD RAYMOND REIGELSPERGER,<br><br><div align=right>Petitioner,</div><br>v.<br><br>STATE OF UTAH,[1]<br><br><div align=right>Respondent.</div> | **MEMORANDUM DECISION<br>AND ORDER DENYING<br>HABEAS-CORPUS PETITION**<br><br>Case No. 4:18-CV-85-DN<br><br>District Judge David Nuffer |

In this federal habeas-corpus case, *pro se* inmate Donald Raymond Reigelsperger,[2] attacks his Utah state convictions. 28 U.S.C.S. § 2254 (2022) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").

Having carefully considered the Petition, (ECF No. 1), State response, (ECF No. 5), and Petitioner's Reply Brief, (ECF No. 12), the Court concludes Petitioner has not overcome the federal habeas standard of review on any of his challenges. The petition is therefore denied.

---

[1] Petitioner must clearly name his custodian (warden or ultimate supervisor of imprisonment facility) as the respondent. R. 2, Rs. Governing § 2254 Cases in the U.S. Dist. Cts. The Court therefore assumes Petitioner means Respondent is Central Utah Correctional Facility Warden Robert Powell.

[2] Because Petitioner is *pro se*, his pleadings must be construed liberally. *Garrett v. Selby, Connor, Maddux, & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). However, this requirement does not obligate the Court to form arguments for him or excuse compliance with procedural rules. *Id.*

I. BACKGROUND ................................................................................................................. 2

II. PETITIONER'S ASSERTED GROUNDS FOR FEDERAL-HABEAS RELIEF .................... 3

III. MERITS ANALYSIS ....................................................................................................... 4

    A. Standard of Review ...................................................................................................... 4

    B. Application of Standard of Review ............................................................................... 8

        1. Jury-Instruction Challenges ..................................................................................... 8

            a. Allegation that jury instructions did not match up with the State's theory of the case presented in the information, preliminary hearing, and trial. ............................................. 8

            b. Allegation that jury instructions about four sexual assault offenses erroneously led jury to think Petitioner could be convicted of the sexual crimes without a culpable mens rea particularly as to consent. ............................................................................................... 15

        2. Motion to Suppress ................................................................................................. 19

            a. Challenge to state court's factual determinations. ................................................... 20

               i. Federal standards governing review of factual determinations and evidentiary sufficiency. ............................................................................................................... 20

               ii. Utah Court of Appeals recitation of facts. ......................................................... 22

            b. Challenge to Utah Court of Appeals's legal analysis and conclusions. ....................... 28

               i. Utah Court of Appeals' legal analysis and conclusions. ...................................... 28

               ii. Utah Court of Appeals did not unreasonably apply clearly established federal law. 36

               iii. Summary .......................................................................................................... 40

IV. CONCLUSION ............................................................................................................. 41

ORDER .............................................................................................................................. 41

## I. BACKGROUND

A jury found Petitioner guilty of aggravated kidnapping and four sexual-assault counts, perpetrated against his then-wife. *Reigelsperger*, 2017 UT App 101, ¶ 1. Petitioner was sentenced to one term of fifteen-years-to-life, to be served consecutively to concurrent two five-to-life sentences and two one-to-five-year sentences. (ECF No. 1, at 1.)

Petitioner pursued these issues on appeal: (A) the allegation "that he was given an incomplete *Miranda* warning and therefore the trial court should have suppressed the statements he made during his interview in the hospital," which he identifies as a "custodial interrogation";

(B) the contention "that the State improperly expanded the scope of its prosecution at the close of trial" by impermissibly broadening "the jury instructions addressing the assault offenses" beyond "the State's asserted theory of the case, with regard to both nonconsent and the intent required to commit forcible sexual abuse"; (C) the assertion that "the jury was not adequately instructed that the State was required to prove he possessed (1) a culpable mens rea as to Wife's nonconsent, for purposes of the sexual assault offenses; and (2) intent or knowledge with respect to the elements of the aggravated kidnapping offense." *Reigelsperger*, at ¶¶ 36-37, 40, 60 (alteration in original). Analyzing these issues on the merits, the Utah Court of Appeals affirmed Petitioner's convictions. *Id.* at ¶¶ 40-97. And the Utah Supreme Court denied Petitioner's certiorari petition. *State v. Reigelsperger*, 409 P.3d 1048 (Utah 2017) (table).

## II. PETITIONER'S ASSERTED GROUNDS FOR FEDERAL-HABEAS RELIEF

Petitioner raises the following issues on federal habeas review:

(a) An allegation that the information was "constructively amended when, after the trial, the jury was instructed on elements which impermissibly modif[ied] the state's theory of the case presented in the information, preliminary hearing, and trial." (ECF No. 1, at 8.) More specifically, Petitioner asserts that "the court impermissibly instructed the jury that it could base guilt on different theories of non-consent . . . as well as theories of specific intent."[3] (*Id.* at 8, 18.)

(b) An allegation that the "jury instructions failed to properly define mens rea." (*Id.* at 10.) More specifically, "[f]or each of the four sexual assault offenses, counts 2-5, Petitioner was

---

[3] Here, Petitioner also argues theories based on the Utah Constitution. (ECF Nos. 1, at 18-19; 12, at 39-40, 49, 52, 109.) He argues violation of the Utah Constitution vis-à-vis other issues too. (*Id.* at 20, 22; ECF No. 12, at 109, 115.) However, the Utah Constitution provides no basis for federal habeas relief and will not be considered further here. *See* 28 U.S.C.S. § 2254 (2022) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").

convicted of . . . 'the jury [was led] to believe he could be convicted of the sexual crimes absent a culpable mens rea specifically regarding consent.'" (*Id.* at 20.)

(c) An allegation that the jury instructions regarding the aggravated-kidnapping offense were "ambiguous and confusing." (*Id.* at 11.) More specifically, the instructions here "were written in such a way that it was unclear which of the . . . [crime] elements [that] the mens rea instruction was linked to . . . thus relieving the state of the burden of proving beyond a reasonable doubt that" Petitioner had the necessary intent during the kidnapping. (*Id.* at 21-22.)

(d) An allegation that "the trial court erred in failing to suppress statements obtained during an illegal [custodial] interrogation." (*Id.* at 13.) More specifically, while Petitioner was in a "mental facility," "involuntarily confined," police officers interrogated him to gain a confession leading to his arrest. (*Id.* at 23-25.)[4] On this issue, Petitioner attacks the state court's factual and legal determinations. (ECF Nos. 1, 12.)

### III. MERITS ANALYSIS

#### A. Standard of Review

The standard of review to be applied in federal habeas cases is found in § 2254, under which this habeas petition is filed. It states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[4] Further, in his Reply Brief, Petitioner inappropriately raises for the first time before this Court double-jeopardy, ineffective-assistance-of-counsel issues, and federal grounds to support his challenges, (*see, e.g.*, ECF No. 12, at 58, 61, 84). Given that this unfairly negates Respondent's chance to rebut these arguments, these issues will not be considered further here. *Cf. Burke v. Regalado*, 935 F.3d 960, 1018 n.44 (10th Cir. 2019) ("[A]n appellant generally waives an argument by waiting to make it in a reply brief.").

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.
(e)(1) In a proceeding instituted by an application for a writ of
habeas corpus in custody pursuant to the judgment of a State court,
a determination of a factual issue made by a State court shall be
presumed to be correct. The applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence.

28 U.S.C.S. § 2254 (2022).

The Court's inquiry centers on whether the Utah Court of Appeals's[5] rejection of

Petitioner's claims "was contrary to, or involved an unreasonable application of, clearly

established Federal law." 28 U.S.C.S. § 2254(d)(1) (2022). This "'highly deferential standard,'"

*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted); *see also Littlejohn v.*

*Trammell*, 704 F.3d 817, 824 (10th Cir. 2013), is "'difficult to meet,' because the purpose of

AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme

malfunctions in the state criminal justice systems,'" and not as a means of error correction."

*Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102

(2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in

judgment))). The Court is not to determine whether the court of appeals's decision was correct or

whether this Court may have reached a different outcome. *See Lockyer v. Andrade*, 538 U.S. 63,

75-76 (2003). "The role of federal habeas proceedings, while important in assuring that

constitutional rights are observed, is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880,

887 (1983). And, "[t]he petitioner carries the burden of proof." *Cullen*, 131 S. Ct. at 1398.

---

[5] The Court looks to the court of appeals's decision on direct appeal, *State v. Reigelsperger*, 2017 UT App
101, *cert. denied*, 406 P.3d 1048 (2017) (table), as it is the last reasoned state-court opinion on the claims at
issue. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Under *Carey v. Musladin*, 549 U.S. 70 (2006), the first step is determining whether clearly established federal law exists relevant to Petitioner's claims. *House v. Hatch*, 527 F.3d 1010, 1017-18 (10th Cir. 2008); *see also Littlejohn*, 704 F.3d at 825. Only after answering yes to that "threshold question" may the Court go on to "ask whether the state court decision is either contrary to or an unreasonable application of such law."

*House*, 527 F.3d at 1018.

> [C]learly established [federal] law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*Id.* at 1016.

Further, "in ascertaining the contours of clearly established law, we must look to the '*holdings* as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Littlejohn*, 704 F.3d at 825 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (emphasis added) (citations omitted)). And, in deciding whether relevant clearly established federal law exists, this Court is not restricted by the state court's analysis. *See Bell v. Cone*, 543 U.S. 447, 455 (2005) ("[F]ederal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) ("[A] state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'") (citation omitted).

If this threshold is overcome, this Court may grant habeas relief only when the state court has "unreasonably applie[d the correct governing legal principle from the Supreme Court's decisions] . . . to the facts of the prisoner's case." *Bryant v. Dowling*, No. 20-5100, 2022 U.S.

App. LEXIS 15695, at *6 (10th Cir. June 8, 2022) (unpublished) (quoting *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets and internal quotation marks omitted)). This deferential standard does not let a federal habeas court issue a writ merely because it determines on its own that the state-court decision erroneously applied clearly established federal law. *See id.* Instead, "for a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam). Indeed, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington*, 562 U.S. at 101 (emphasis in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

This highly demanding standard was meant to pose a big obstacle to habeas petitioners. *Id.* at 102. Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. It maintains power to issue the writ when no possibility exists that "fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents. It goes no further." *Id.* To prevail in federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The deferential nature of this standard "applies not only to claims the state court squarely addressed, but also to claims it reached only cursorily." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 740 (10th Cir. 2016). "When the state court does not explain its reasoning, the applicant must still show that there was no reasonable basis for the state court to deny relief." *Black v. Workman*, 682 F.3d 880, 892 (10th Cir. 2012) (internal quotation marks omitted).

Against this backdrop, the Court now applies the standard of review to this case's circumstances.

## B. Application of Standard of Review

Remembering that review is tightly restricted by the federal habeas standard of review, this Court observes that, when analyzing federal issues, the Utah Court of Appeals selected the correct governing legal principles with which to analyze these issues, and the court of appeals's application of those principles was not unreasonable.

### 1. Jury-Instruction Challenges

#### a. Allegation that jury instructions did not match up with the State's theory of the case presented in the information, preliminary hearing, and trial.

Petitioner frames his challenge as follows: The information was invalidly "constructively amended when, after the trial, the jury was instructed on elements which impermissibly modif[ied] the state's theory of the case presented in the information, preliminary hearing, and trial."[6] (ECF No. 1, at 8.) More specifically, Petitioner asserts that "the court impermissibly instructed the jury that it could base guilt on different theories of non-consent . . . as well as theories of specific intent." (*id.* at 8, 18.) Without any analysis, Petitioner asserts, "The rights of due process, confrontation, cause and nature of the charges, and the prohibition against modifying indictment, and trial by jury, and double jeopardy guarantees by the 14th, 6th, 5th Amendments to the United States Constitution were violated." (ECF No. 1, at 19.) Again without analysis, in this section, Petitioner cites three United States Supreme Court cases. *See United States v. Miller*, 471 U.S. 130 (1985) (holding in a federal criminal case that (a) any variation

---

[6] The Utah Court of Appeals mentioned ineffective-assistance-of-counsel as one possible way Petitioner may have raised this issue before that court. *Reigelsperger*, at ¶ 71. But Petitioner has not raised in the Petition ineffective assistance as to any of the issues here. He does raise ineffective-assistance-of-counsel in his Reply Brief, but that--again--is too late. (ECF No. 12, at 84, 90.) The Court therefore does not consider that angle.

between indictment counts and convicted crimes were in conformance with facts proved at trial and (b) there was no showing that variance prejudiced trial fairness); *Stirone v. United States*, 361 U.S. 212 (1960) (holding in a federal Hobbs Act case that, when grand jury had indicted defendant for interfering with interstate importation of sand, the conviction could not stand when trial court also allowed evidence of interference with interstate importation of steel that was not part of the indictment and the Court could not be sure that verdict was not based on steel evidence instead of evidence matching up with indictment as to sand); *Berger v. United States*, 295 U.S. 78 (1935) (holding in a federal criminal case that no variance between indicted charge and convicted crime "ought to ever be regarded as material where the allegation and proof substantially correspond, or where the variance was not of a character which could have misled the defendant at the trial," so long as "the variance be not such as to deprive the accused of his right to be protected against another prosecution for the same offense").

Respondent counters by setting forth the federal habeas standard of review and arguing Petitioner's failure to meet the standard. (ECF No. 5, at 29.) This is the proper way to frame Petitioner's challenge in terms of the standard of review: "Did the Utah Court of Appeals's analysis--of his argument that the charges and allegations in the information, preliminary hearing, and trial did not support the jury instructions resulting in conviction for, 'the full range of conduct prohibited by the statutes under which he was charged,' *Reigelsperger*, at ¶ 70--result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"? 28 U.S.C.S. § 2254(d)(1) (2022).

In evaluating this issue, the Utah Court of Appeals wrote in pertinent part:

> As the State points out, as a factual matter, neither the
> information nor the prosecution's argument at the preliminary

hearing indicates that "the State was limiting itself to specific theories of consent or specific intent," nor did the court order binding Reigelsperger over on the sexual assault offenses "limit the State to such specific theories." Moreover, as a legal matter, Reigelsperger has not demonstrated that the asserted errors should have been obvious to the trial court . . . .

Reigelsperger was charged with four counts of aggravated sexual assault, and the language of each charge was drawn directly from the statutory definition of the offense. *See* Utah Code Ann. § 76-5-405 (LexisNexis 2012). Each charge asserted the full range of conduct and intent that could give rise to the offense, alleging that Reigelsperger, in the course of committing or attempting to commit rape, object rape, forcible sodomy, or forcible sexual abuse, did

> (i) use, or threaten the victim with the use of, a dangerous weapon . . . ;
> (ii) compel, or attempt to compel, the victim to submit to rape, object rape, forcible sodomy, or forcible sexual abuse, by threat of kidnapping, death, or serious bodily injury to be inflicted imminently on any person; or
> (iii) receive aid or abetment from one or more persons . . . .

The jury instructions mirrored the charges. The jury was instructed that Reigelsperger committed aggravated sexual assault if he, in the course of an object rape (count II), forcible sodomy (count III), or forcible sexual abuse (counts IV and V), used or threatened Wife with the use of a dangerous weapon or compelled or attempted to compel Wife to submit to the act by threat of kidnapping, death, or serious bodily injury to be inflicted imminently on any person.

The jury was also instructed as to the elements of the underlying sexual assault offenses. To convict Reigelsperger of forcible sexual abuse, the jury was required to find that, among other things, Reigelsperger engaged in certain conduct without the consent of Wife, "with the intent to cause substantial emotional or bodily pain to [Wife] or with the intent to arouse or gratify the sexual desire of any person." These instructions closely track the statutory definition of forcible sexual abuse. *See id.* § 76-5-404(1).

When, as here, a defendant is charged with aggravated sexual assault in language that essentially reiterates the statutory definition of that offense, the defendant has "notice that he [will] have to defend against any variation of [sexual] assault that the evidence might support." *Cf. State v. Sanislo*, 2015 UT App 232, ¶

16, 359 P.3d 1287. Reigelsperger was charged with four counts of aggravated sexual assault and convicted of four sexual assault offenses, based on the same general evidence and allegations outlined in the information and presented at the preliminary hearing. It is difficult to perceive how a "reasonable person aware of [the alleged] facts and the charged offenses could have been surprised" when, as was the case here, the prosecution pursued convictions based on the statutorily defined variations of intent and conduct that give rise to the lesser included sexual assault offenses. *Cf. id.* ¶ 19; *State v. Carruth*, 1999 UT 107, ¶¶ 13-14, 993 P.2d 869 (concluding that the prosecution may request jury instructions for lesser offenses necessarily included in those charged).

Reigelsperger cites no legal decision or other authority suggesting that the charges and allegations in the information did not support prosecution of the full range of conduct prohibited by the statutes he was charged with violating. . . .

Because Reigelsperger has failed to provide any settled law supporting his claim, . . . Reigelsperger has not established plain error . . . with regard to the theories and evidence underlying his sexual assault convictions. *See . . . State v. Dean*, 2004 UT 63, ¶ 21, 95 P.3d 276 (rejecting claim of plain error because "law in this area was not plainly settled so as to have adequately guided the trial court" at time alleged error occurred).

*Reigelsperger*, at ¶¶ 65-71.

First, the Utah Court of Appeals made factual findings that (a) "neither the information nor the prosecution's argument at the preliminary hearing indicate[d] that 'the State was limiting itself to specific theories of consent or specific intent,'" and, (b) "the court order binding Reigelsperger over on the sexual assault offenses [did not] 'limit the State to such specific theories.'" *Id.* at ¶ 65. And the federal statute requires these factual determinations to "be presumed correct." 28 U.S.C.S. § 2254(e)(1) (2022). Petitioner is burdened with "rebutting the presumption of correctness by clear and convincing evidence." *Id.* But his bald assertion that these factual determinations were wrong does not carry that burden. They are thus presumed correct here.

Second, Petitioner does cite the three United States Supreme Court cases described above, *Miller*, 471 U.S. at 130; *Stirone*, 361 U.S. at 212; *Berger*, 295 U.S. at 78, trying perhaps to show that the court of appeals' analysis "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.S. § 2254(d)(1) (2022). However, under the Fifth Amendment, the *Miller* decision *upheld* the criminal defendant's conviction, as he was prosecuted on an indictment that plainly set forth the offense upon which he was eventually convicted. 471 U.S. at 131, 134, 145 (stating "[c]ompetent defense counsel certainly should have been on notice that the offense was charged and would need to be defended against"). Likewise, *Berger affirmed* that a criminal conviction can withstand some variance from the indictment when the goal of correspondence between allegations and proof are met--that is, the accused has been (a) properly informed of the allegations and proof before conviction so the accused will not be prejudicially taken by surprise, and (b) protected from another prosecution for the same offense. 295 U.S. at 83. These two cases then stand for the opposite of what Petitioner hopes for here: the overturning of his conviction based on variance.

By comparison, *Stirone* does overturn a conviction based on variance between the indictment and the crime as convicted. 361 U.S. at 218-19. But the issue there was that the indictment involved one set of defendant's activities allegedly violating the Hobbs Act, while the proof at trial expanded to include a second set of defendant's activities allegedly violating the Hobbs act. *Id.* And the Court could not be certain--as it had to be to affirm--that the conviction was based on just the proof of the first set of activities alleged in the indictment. *Id.* The *Stirone* facts are inapposite to the ones Petitioner faced. In his case there was only one set of activities at issue--i.e., the uninterrupted series of sexual assaults in a single encounter, as the Utah Court of

Appeals put it, "based on the same general evidence and allegations outlined in the information and presented at the preliminary hearing." *Reigelsperger*, at ¶ 69. In other words, though Petitioner poses this issue as one of a "variance," the court of appeals apparently saw this situation as lacking a variance; instead, viewing the charges as consistent through the whole proceeding.

All three of Petitioner's cited cases rely on the Fifth Amendment and its due-process principles and language, as the standard by which we test the fairness and validity of any variance between charging documents (and ensuing criminal proceedings), comparing them to the ultimate crime of conviction. The Utah Court of Appeals therefore selected the correct legal tenets against which to test the fairness and validity of any of that kind of variance here. *See House*, 527 F.3d at 1017-18. In summary, the court stated, "When, as here, a defendant is charged with aggravated sexual assault in language that essentially reiterates the statutory definition of that offense, the defendant has 'notice that he [will] have to defend against any variation of [sexual] assault that the evidence might support.'" *Reigelsperger*, at ¶ 69 (quoting *State v. Sanislo*, 2015 UT App 232, ¶ 16). The court followed up with this conclusion:

> It is difficult to perceive how a "reasonable person aware of [the alleged] facts and the charged offenses could have been surprised" when, as was the case here, the prosecution pursued convictions based on the statutorily defined variations of intent and conduct that give rise to the lesser included sexual assault offenses."

*Id.* (quoting *Sanislo*, at ¶ 19). This is the same due-process language of notice and opportunity-to-be-heard contained in the Supreme Court cases cited by Petitioner.

Thus, Petitioner has not carried his burden here of showing that the Utah Court of Appeals unreasonably applied relevant Supreme-Court precedent in upholding the jury instructions here. He cited without analysis three Supreme-Court cases that addressed variance

between an indictment and convicted crime. But, when these cases are reviewed, it is clear that they are not on point, as required by the federal habeas standard of review; in fact, two out of the three cases reached the opposite result that Petitioner argues for.[7]

Instead, the Utah Court of Appeals was right to analyze how the State's charges, preliminary hearing, and trial theories gave Petitioner notice and an opportunity to defend himself on the very crimes of which he was convicted. This challenge therefore does not provide Petitioner a basis for habeas relief.

---

[7] The five other United States Supreme Court cases cited in the Reply Brief are also unhelpful to Petitioner:

(1) *Russell v. United States*, 369 U.S. 749 (1962), from which he paraphrases, "[A] criminal defendant cannot 'be convicted on the basis of facts' different than those facts on which the charges were based." (ECF No. 12, at 38 (quoting *Russell*, 369 U.S. at 770).) He uses the *Russell* case only to state this standard legal tenet, with which the Utah Court of Appeals clearly agreed, not to show the facts were on point with this case (the facts are not) and that the court of appeals unreasonably applied Russell's principles to his case (it did not). The *Russell* case thus does not support Petitioner's quest for habeas relief.

(2) *Pointer v. Texas*, 380 U.S. 400 (1965), is cited after Petitioner's argument that the Due Process Clause protects an accused from having to prepare a defense on the alleged facts and elements of a particular crime unless those alleged facts and elements essentially match up at preliminary hearing, pretrial, trial, and conviction. (ECF No. 12, at 56.) Of course, the Utah Court of Appeals agreed that due process requires that a defendant have notice of the charges and factual allegations throughout criminal proceedings and an opportunity to properly defend. However, *Pointer* is inapplicable to the current case, because Pointer is about a Confrontation Clause issue, not a variance issue. *See Pointer*, 380 U.S. at 400-01.

(3) *Schmuck v. United States*, 489 U.S. 705 (1989), is cited after Petitioner's statement that "[a]t the time of petitioner's trial it was well established that a court must give 'an accurate instruction upon the basic elements of an offense.' *See State v. Roberts*, 711 P.2d 235, 239 (Utah 1985)." (ECF No. 12, at 63.) Again, this basic standard is not disputed by either the Utah Court of Appeals or this Court. However, the court of appeals concluded that the jury instruction did accurately reflect the basic elements of the offenses, and none of Petitioner's recitations of basic legal standards detracts from the court of appeals's conclusion here.

(4) *Apprendi v. New Jersey*, 530 U.S. 466 (2000), is cited without analysis and is inapposite here. It stands for the proposition that "the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence . . . be made by a jury on the basis of proof beyond a reasonable doubt." *Id.* at 469, 497.

(5) *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), is quoted as follows: "The only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" (quoting *Cupp v. Naughten*, 414 U.S. 145, 154 (1973)). But, as the instruction here was not determined to be "ailing," this case is inapposite.

Also, the Tenth Circuit cases cited by Petitioner are not helpful under the standard of review, found at 28 U.S.C.S. § 2254(d)(1) (2022) (emphasis added), stating that a habeas petition from a state prisoner may not be granted regarding "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*." (ECF No. 12, at 51 (citing *United States v. Farr*, 535 F.3d 1174, 1181 (10th Cir. 2008); *United States v. Bishop*, 469 F.3d 896, 902-03 (10th Cir. 2006); *Turrentine v. Mullin*, 390 F.3d 1181, 1190 (10th Cir. 2004); *United States v. Pina*, 974 F.2d 1241, 1244 (10th Cir. 1992); *United States v. Mosley*, 965 F.3d 906, 915 (10th Cir. 1992).)

### b. Allegation that jury instructions about four sexual assault offenses erroneously led jury to think Petitioner could be convicted of the sexual crimes without a culpable mens rea particularly as to consent.

Petitioner frames his challenge as follows: The jury instructions did not properly define the applicable mens rea. (ECF No. 1, at 10.) He asserts that "the requirement that the petitioner must have acted intentionally, knowingly, or recklessly was placed in the middle of the instruction, while the element of consent was placed at the bottom of the list. The mens rea regarding consent is required by Utah statute." (*Id.* at 20.) As explained above in footnote three, the requirements of Utah law, as opposed to the Federal Constitution, are not cognizable in this federal habeas action. *See* 28 U.S.C.S. § 2254 (2022) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."). Petitioner points out that the State had conceded on direct appeal that the sexual-assault instructions were erroneous. (ECF No. 1, at 20.) But, on plain-error and ineffective-assistance-of-counsel analyses, the court of appeals concluded that Petitioner was not prejudiced. *Reigelsperger*, at ¶¶ 72, 76, 87.

Petitioner does not raise ineffective-assistance-of-counsel in the Petition, but only plain error. (ECF No. 1, at 20.) And, in the Petition, he offers no federal ground to challenge the court of appeals's analysis rejecting plain error as a basis to overturn the sexual-assault convictions because of the erroneous jury instructions. He instead flatly states, without support, analysis, or citation, "There is a reasonable probability of a more favorable outcome to Petitioner's trial, but for these errors. The use of these instructions violated the petitioner's right to a jury trial and due process under the 6th and the 14th Amendments of the U.S. Constitution."[8]

---

[8] Again, as explained in footnote seven, the United States circuit court opinions and Utah state cases cited

Except for the discussion about ineffective assistance of counsel (which is not at issue here), the court of appeals's examination of these jury instructions refers not at all to the Federal Constitution, citing only to Utah state statutes and cases. That aligned with Petitioner's arguments on direct appeal, which did not assert federal grounds for reversal.[9] (ECF No. 5-3.)

---

by Petitioner in his Reply Brief are not helpful under the federal standard of review. (ECF No. 12, at 70-71 (citing *United States v. Ramone*, 218 F.3d 1229, 1235 (10th Cir. 2008); *Wood v. Alaska*, 957 F.2d 1544, 1551 (9th Cir. 1992); *State v. Barela*, 2015 UT 22; *State v. Richardson*, 2013 UT 50).)

And again, factually dissimilar United States Supreme Court cases that Plaintiff cites to support basic legal tenets--upon which all may agree--do not meet Petitioner's burden to show that the Utah Court of Appeals unreasonably applied on-point United States Supreme Court precedent. *See, e.g., Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013); *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2407 (2011); *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002); *United States v. Gandin*, 515 U.S. 506, 510 (1995); *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *United States v. Olano*, 507 U.S. 725, 533-35 (1993); *Strickland v. Washington*, 466 U.S. 668 (1984); *Yates v. Evatt*, 500 U.S. 391 (1981); *Cupp*, 414 U.S. at 147; *Chapman v. California*, 386 U.S. 18, 24 (1967).

[9] Based on the failure to exhaust and procedural default, then, Petitioner is foreclosed from raising federal grounds here.

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To satisfy the exhaustion requirement, a state prisoner must fairly present his claims to the state's highest court--either by direct review or in a postconviction attack--before asserting them in federal court. *See Fairchild v. Workman*, 579 F.3d 1134, 1151 (10th Cir. 2009). "Fair presentation of a prisoner's claim to the state courts means that the substance of the claim must be raised there." *Patton v. Mullin*, 425 F.3d 788, 809 n.7 (10th Cir. 2005) (internal quotation marks omitted). The "petitioner bears the burden of demonstrating that he has exhausted his available state remedies." *McCormick v. Kline*, 572 F.3d 841, 851 (10th Cir. 2009) (internal quotation marks omitted).

If the federal court determines that an applicant's claims are not exhausted, it may, among other things, deny the claims on the merits, *see* 28 U.S.C. § 2254(b)(2), or dismiss the unexhausted claims without prejudice to allow the applicant to return to state court to exhaust the claims, *see Bland v. Sirmons*, 459 F.3d 999, 1012 (10th Cir. 2006). However, permitting the applicant to return to state court is not appropriate if the applicant's claims are subject to an anticipatory procedural bar. *See id.*; *Frost v. Pryor*, 749 F.3d 1212, 1231 (10th Cir. 2014) ("Anticipatory procedural bar occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." (internal quotation marks omitted)).

When a federal court applies an anticipatory procedural bar to a habeas applicant's claims, the applicant's claims are procedurally defaulted for purposes of federal habeas relief. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (noting "there is a procedural default for purposes of federal habeas" if "the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred").

*Reid v. Long*, No. 21-1109, 2021 U.S. App. LEXIS 30659, at *9-11 (10th Cir. Oct. 14, 2021) (unpublished).

The Court thus agrees with Respondent that Petitioner "has failed to establish that th[e court of appeals's] decision contradicted or unreasonably applied Supreme Court authority." (ECF No. 5, at 31.) On this issue, he has not carried his burden under the federal habeas standard of review and so may not obtain relief.

### c. Allegation that jury instructions about the aggravated-kidnapping offense were drafted so that it was not clear which criminal elements were linked to intent requirements.

Petitioner attacks the jury instructions about the aggravated-kidnapping offense as "ambiguous," relieving the State "of its burden of proving every element of the aggravated kidnapping charge . . . beyond a reasonable doubt." (ECF No. 1, at 11.)[10] He specifically contends that the "Utah aggravated kidnapping statute (76-5-302) requires the accused to act 'intentionally or knowingly' while 1) committing kidnapping or unlawful detention; and 2) while committing the aggravating factor," yet

> jury instructions . . . were . . . unclear [about] which of the many elements listed the mens rea instruction was linked to. The

---

[10] Here, with no analysis or hint as to their applicability, Petitioner cites in the Petition two United States Supreme Court cases. *See Boyde v. California*, 494 U.S. 370 (1990); *In re Winship*, 397 U.S. 358 (1970). These two cases are so irrelevant to the case at hand that they bear mention only in a footnote.

In *Boyde*, the petitioner challenged jury instructions "used in the penalty phase of petitioner's capital murder trial," arguing that the instructions violated the Eighth Amendment. 494 U.S. at 372. But the Court rejected Petitioner's arguments, concluding there was no violation when "there is not a reasonable likelihood that the jurors in petitioner's case understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by petitioner." *Id.* at 386. Meanwhile, here regarding Reigelsperger, the challenge to the jury instructions is not based on the Eighth Amendment, nor any other constitutional ground. Aside from the fact that both *Boyde* and *Reigelsperger* involve challenges to jury instructions, there is no pertinent relationship between the cases, under the federal habeas standard of review. *See House*, 527 F.3d at 1016 ("[C]learly established [federal] law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.").

Meanwhile, *Winship* bears even less similarity to *Reigelsperger*. 397 U.S. 358. *Winship* featured the Court answering yes to "the single, narrow question whether proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult." *Id.* at 359. Perhaps Petitioner sees a connection because his argument was that the State had the "burden of proving every element of the aggravated kidnapping charge . . . beyond a reasonable doubt." (ECF No. 1, at 11.) But the issue of whether Petitioner had to be found guilty to a standard beyond a reasonable doubt is not the question in this case; it is instead, whether the jury instruction's format prejudicially confused the jury into not applying that standard to each element of the convicted crime.

The Court does not further consider these impertinent cases.

> requirement that the defendant acted 'intentionally or knowingly' was placed at the end of the list of elements and there is a reasonable probability that the jury misapplied the mens rea instruction.

(ECF No. 1, at 21.) He urges that "the court's use of the ambiguous jury instruction violated Petitioner's right to a jury trial and due process under the [Federal] Constitution." (*Id.* at 22.)

Petitioner does not raise ineffective-assistance-of-counsel in the Petition, but only plain error. (ECF No. 1, at 11, 21-22.) And he offers no federal ground upon which to challenge the court of appeals's analysis rejecting plain error as a basis to overturn the kidnapping conviction because of the erroneous jury instructions.[11]

Except for the discussion about ineffective assistance of counsel (which is not at issue here), the court of appeals's examination of these jury instructions does not refer to the Federal Constitution, citing only to Utah state statutes and cases. *Reigelsperger*, at ¶¶ 88-96. The Court thus agrees with Respondent that Petitioner "has failed to establish that th[e court of appeals's] decision contradicted or unreasonably applied Supreme Court authority." (ECF No. 5, at 33.) On this issue, he has not carried his burden under the federal habeas standard of review and so may not obtain relief.

---

[11] Petitioner complains in his Reply Brief that

> along with the state court relying on questionable self-serving state court decisions to rule on petitioner's unconstitutional jury instruction issues, the state court's ignoring federal law, as a result, making a decision on this issue which was contrary to clearly established federal law, entitles petitioner's jury instruction issues as above to de novo review by this court.

(ECF No. 12, at 91-92 (citing 28 U.S.C.S. § 2254(d)(1) (2022); *Panetti v. Quarterman*, 551 U.S. 930 (2007).)

But on direct appeal Petitioner did not pursue arguments based on the Federal Constitution, (Appellant's Opening Brief, ECF No. 5-3), so of course the Utah Court of Appeals did not analyze his issues vis-à-vis the Federal Constitution. Thus, as in footnote nine, any issues about the Federal Constitution's application to the linking of criminal elements and intent, as to jury instructions on aggravated kidnapping, are foreclosed based on failure to exhaust and procedural default.

## 2. Motion to Suppress

The state courts ruled that Petitioner was not "in custody" for purposes of *Miranda* during his interview with police officers that yielded the inculpatory statements that he unsuccessfully sought to keep from the jury. *Reigelsperger*, at ¶ 97.

But Petitioner asserts that the state trial court should have suppressed his statements because his statements were the result of a custodial interrogation with an inadequate *Miranda* warning. (ECF No. 1, at 13.) Petitioner contends the "totality of circumstances" of the interrogation "violated fundamental fairness and negated Petitioner's ability to make a knowing, intelligent, and voluntary decision to waive his right to remain silent and his right to counsel." (*Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 295-96 (1991); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Brewer v. Williams*, 430 U.S. 387 (1977); *Miranda v. Arizona*, 384 U.S. 436 (1966).) Petitioner urges that "the petitioner's protection against self-incrimination, right to counsel and due process under the 5th, 6th, and 14th Amendments to the U.S. Constitution were violated." (*Id.* at 25.) He attacks both the state court's (a) determination of the relevant facts as unreasonable and (b) application (to those relevant facts) of clearly established federal law as unreasonable. (ECF No. 12, at 106.)

The standard of review for these issues--(a) the challenge to factual findings underlying the conclusion that Petitioner was not "in custody"; versus (b) the challenge to the ultimate conclusion that Petitioner was "in custody"--was set forth by the United States Supreme Court:

> Two discrete inquiries are essential to the [ultimate "in custody" determination under *Miranda*]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement'

19

of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). The first inquiry, all agree, is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness under 28 U.S.C. § 2254(d). The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.

. . . . [T]he trial court's superior capacity to resolve credibility issues is not dispositive of the "in custody" inquiry. Credibility determinations, as in the case of the alleged involuntariness of a confession, *see Miller*, 474 U.S. at 112, may sometimes contribute to the establishment of the historical facts and thus to identification of the "totality of the circumstances." But the crucial question entails an evaluation made after determination of those circumstances: if encountered by a "reasonable person," would the identified circumstances add up to custody as defined in *Miranda?* See *Berkemer* v. *McCarty*, 468 U.S. 420, 442 (1984) (court must assess "how a reasonable man in the suspect's position would have understood his situation"); *cf. Miller*, 474 U.S. at 116-17 ("Assessments of credibility and demeanor are not crucial to the proper resolution of the ultimate issue of 'voluntariness.'").

*Thompson v. Keohane*, 516 U.S. 9, 112-14 (1995).

### a. Challenge to state court's factual determinations.

Petitioner initially asserts the unreasonableness of the state court's determination of the underlying facts relevant to its ultimate conclusion that he was not "in custody" under *Miranda*. (ECF No. 12, at 106.)

### i. Federal standards governing review of factual determinations and evidentiary sufficiency.

The state court's first inquiry was "what were the circumstances surrounding the interrogation." *Thompson*, 516 U.S. at 112. Here, the state-court findings set the scene and reconstructed the players' lines and actions. *Id.* Such findings "attract a presumption of correctness under 28 U.S.C. § 2254(d)." *Id.* And, "'the petitioner has the burden of rebutting the

presumption by "clear and convincing evidence."'" *Davis v. Ayala*, 576 U.S. 257, 271 (2015)

(quoting *Rice v. Collins*, 546 U.S. 333, 338 (quoting 28 U.S.C.S. § 2254(e)(1) (2022))).

      State-court factual findings may not be characterized "as unreasonable 'merely because

[another court] would have reached a different conclusion in the first instance.'" *Brumfield v.*

*Cain*, 576 U.S. 305, 313 (2015) (quoting *Wood v. Allen*, 558 U. S. 290, 301 (2010)). Section

2254(d)(2) instead demands the state trial court receive "substantial deference." *Id.* at 314.

      The question as stated in the Supreme Court's *Richter* case is whether the state court's

factual determinations were "'so lacking in justification' as to give rise to error 'beyond any

possibility for fairminded disagreement.'" *Dunn v. Madison*, 138 S. Ct. 9, 12 (2017) (per curiam)

(quoting *Richter*, 562 U.S. at 103). "This 'standard is difficult to meet.'" *Mays v. Hines*, 141 S.

Ct. 1145, 1149 (2021). As explained further by the Supreme Court:

> The term "unreasonable" refers not to "ordinary error" or even to
> circumstances where the petitioner offers "a strong case for relief,"
> but rather to "'extreme malfunctions in the state criminal justice
> syste[m].'" [*Richter*, 562 U.S. at 102.] In other words, a federal
> court may intrude on a State's "'sovereign power to punish
> offenders'" only when a decision "was so lacking in justification . .
> . beyond any possibility for fairminded disagreement." *Id*. at 103.
>    If this rule means anything, it is that a federal court must
> carefully consider all the reasons and evidence supporting the state
> court's decision. After all, there is no way to hold that a decision
> was "lacking in justification" without identifying--let alone
> rebutting--all of the justifications. *Id.* Any other approach would
> allow a federal court to "'essentially evaluat[e] the merits *de novo*'"
> by omitting inconvenient details from its analysis. *Shinn v. Kayer*,
> 141 S. Ct. 517, 523 (2020); *see also Richter*, 562 U. S., at 102-103.

*Mays*, 141 S. Ct. at 1149. All that matters is whether the Utah court, "notwithstanding its

substantial 'latitude to'" make a reasonable determination, "still managed to blunder so badly that

every fairminded jurist would disagree." *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123

(2009)). Still, "deference does not imply abandonment or abdication of judicial review," and

"does not by definition preclude relief." *Miller-El* v. *Cockrell*, 537 U. S. 322, 340 (2003).

### ii. Utah Court of Appeals recitation of facts.

The facts underlying Petitioner's interrogation were recited by the Utah Court of Appeals

"in a light most favorable to the jury's verdict," *Reigelsperger*, at ¶ 2, n. 1[12]:

> Shortly after [the crimes], police officers arrived at the house and took Reigelsperger into custody, not under suspicion of committing a crime, but based on the risk that he was "going to harm himself or someone else." Reigelsperger was taken in an ambulance to a nearby hospital. A police officer followed and, upon arriving at the hospital, filled out forms regarding Reigelsperger's involuntary admittance. The officer reported a substantial risk that Reigelsperger would harm himself unless taken into protective custody, and the officer indicated that he "wanted to be notified prior to the patient's discharge." Reigelsperger was subsequently transferred to the University Neuropsychiatric Institute (UNI).
>
> Reigelsperger spent several days at UNI. Five days after he was admitted, two police detectives went to UNI to ask Reigelsperger for a DNA sample. One of the detectives (Detective) had been in "daily contact" with a UNI staff member, "hop[ing]" to be "told when [Reigelsperger] was going to be released" so she could arrest him at that time. Detective apparently believed, based on her communications with UNI staff, that Reigelsperger would be released the following day.
>
> Although Detective brought a warrant for Reigelsperger's arrest, UNI staff initially refused to provide access to Reigelsperger or even to acknowledge his presence there. But the detectives were persistent and told UNI staff that they would be taking Reigelsperger into custody that day. They reached an understanding with UNI staff that they would obtain a DNA sample from Reigelsperger if he consented, and they would then arrest Reigelsperger and remove him from UNI.

---

[12] The Utah Court of Appeals reviewed "the trial court's factual findings for clear error." *Reigelsperger*, at ¶ 36. It is worth noting here that, when the state trial court announced its oral findings on the motion to suppress, the court observed that the findings were based on its review of "the briefs, a number of the cases that were cited in the briefs, . . . the transcript of the recording of the interview, and . . . the [audio version of] interview, as well as . . . the testimony [from the suppression hearing]." (ECF No. 5-3, at 81.) The trial court was the only judge who had the advantage of seeing the interview participants' demeanor and hearing their vocal intonations from the audio recording of the interview. Such an advantage deserves deference. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (stating "§ 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

The detectives were escorted to a fairly large room with a couch flanked by two chairs. The detectives sat down in the chairs and waited until UNI staff brought Reigelsperger to the room. Detective was not in uniform and her badge was not visible. The detective who accompanied her was wearing his informal police uniform and his badge and was carrying handcuffs. Both were unarmed.

Reigelsperger arrived and sat down on the couch. He was not restrained by the detectives or by UNI staff, and he was not "hooked up to any sort of medical equipment." Reigelsperger was not told that he was under arrest, that the detectives had a warrant for his arrest, or that the detectives planned to remove him from UNI. Reigelsperger also was not told that he was a suspect in a crime, although he had learned from other sources that Wife had contacted the police and reported what had occurred.[13]

Detective asked if Reigelsperger would provide a DNA sample, and he provided one. Reigelsperger then began talking as though he "wanted to get his side of the story out." Detective stopped him and informed him of at least some of his *Miranda* rights, but the recitation and explanation of Reigelsperger's *Miranda* rights were not recorded because the detectives' audio recorder had not yet been turned on.

Detective also provided Reigelsperger with a form entitled "Miranda Waiver." The form provided: "You have the right to remain silent. Anything you say may be used against you in court. You have the right [to] an attorney. If you cannot afford an attorney, one will be appointed free of charge." The form contained the additional language, "Do you understand these rights? Will you explain your side of the story? If so, please sign."

After Detective provided Reigelsperger with the form and discussed it with him, the audio recorder was turned on. Detective asked Reigelsperger if he wanted to keep talking with her, and Reigelsperger immediately indicated that he did and signed the form. He began telling the detectives about the day in question. Detective asked Reigelsperger several questions, which were largely about his divorce and living situation, his intent in going to the client's home on the day in question, and the events that occurred there. Reigelsperger talked at length without indicating any desire to cease speaking with the detectives or to stop answering their questions. The recorded interview lasted less than thirty minutes.

During the interview, Reigelsperger said his plan was to harm himself and for Wife to find him, but he had "no idea" Wife would

---

[13] Indeed, the interview transcript shows that it was not until Petitioner was arrested that he realized this, stating, "Wow. So she pressed these charges against me?" (ECF No. 5-4, at 94.)

be at the house that day. He recounted that when Wife arrived, she "freaked out," and he "[g]rabbed her by [the] arm." When asked if Wife had said "she wanted to leave, like leave the house" or "[g]et away from [him]," Reigelsperger replied, "I think she might [have], yes."

Reigelsperger also recalled telling Wife that he wanted her to get into the hot tub, but she said, "No, I'm not going to," and he responded, "Oh yes, you are." Reigelsperger said he asked Wife for a kiss and "one last jacuzzi," but she said, "I don't feel like doing it and you're not going to make me," and he replied, "Oh yes you are." Reigelsperger reported that he "grabbed [Wife] and held her and kissed her" while they were in the hot tub, and she "pushed [him] away and went and [cried] in the corner." When asked whether further sexual contact occurred, Reigelsperger stated that Wife did not perform oral sex on him.

At the conclusion of the interview, Detective informed Reigelsperger that he was going to be arrested. The detectives then handcuffed Reigelsperger and removed him from UNI.

*Reigelsperger*, at ¶¶ 12, 13-22.

To be clear then (drawn from the court of appeals' opinion, *Reigelsperger*, at ¶¶ 12, 13-22), these facts are thus presumed correct here: At police direction, Petitioner was taken to a nearby hospital, where he was involuntarily admitted and kept for mental-health treatment. Any constraints on Petitioner's freedom while involuntarily committed were due to mental-health treatment. Police detectives did not effectively supervise Petitioner's stay at UNI. This finding was based on subsidiary findings of lack of police oversight of Petitioner's treatment; obstacles detectives faced in getting information from UNI; UNI's reluctance to acknowledge Petitioner's presence there and to let detectives meet with Petitioner; and a detective's statements that, while she hoped UNI would tell her before releasing Petitioner, she did not know whether UNI would. At the interview time, Petitioner was taken by medical staff from his room at UNI to a big waiting space, where he sat on a couch between two chairs where detectives were waiting. Before the interview, Petitioner left a message for the victim apologizing for "intruding on [her] sexuality"; detectives had asked for a DNA sample; and detectives notified Petitioner that he had

the right to remain silent, his words could be used against him in court, and he had a right to counsel. Detectives' questions focused on the day of the crime and the events prefacing it. Petitioner had not been told of the detectives' intent to arrest him. During the interview, which was recorded and less than thirty minutes Reigelsperger was not told he could leave. Petitioner appeared "rather eager to tell his side of the story." There is no evidence that detectives used coercive techniques. Detectives were not numerous. Detectives were unarmed, carrying only a pair of handcuffs, and not in full uniform. Petitioner was not restricted by medical equipment, by the detectives, or by UNI staff. Given his status as a patient in the facility, Petitioner was not free to leave the waiting space on his own volition. These are the facts upon which the court of appeals relied to make its mixed-law-and-fact conclusion that Petitioner was not "in custody" for *Miranda* purposes.

### iii. Petitioner's arguments regarding the facts.

However, in addition to the presumed factual findings, in his Petition, Petitioner tried to add that "UNI staff described Petitioner as 'bad off,' 'delusional,' and heavily medicated. UNI staff wanted to continue his mental commitment." (ECF No. 1, at 23.) "Petitioner was heavily medicated, suicidal, and confused." (*Id.* at 24.) Petitioner did not cite to the record to support these allegations, so they will not be considered further here.

Also, in his Petition, Petitioner asserts that he "was aware" that "the arresting officer stated on the 'pink slip' [involuntarily committing Petitioner at UNI] to notify [the arresting officer] prior to Petitioner's release," and that, "from [Petitioner's] points of view," this detail "meant he was in police custody." (*Id.* at 23.) This allegation was also not supported with a citation to the record and will not be considered further either.[14]

---

[14] Additionally, a preview is in order here that the *Miranda* standard is not about what the particular interrogated person believed, but what "'a *reasonable* person would have felt'" under the "'all of the circumstances

Moving on to Petitioner's arguments in his Reply Brief, he sets forth, "Facts Relevant to Miranda/Custody Issues," (ECF No. 12, at 31-34), but in that section provides no arguments or analysis, so his characterization of the facts from that section is not further considered.

Moreover, in his Reply Brief, Petitioner catalogues "Evidence Presented." (*Id.* at 109-14.) Here, citing to the suppression-hearing transcript, he narrates his own version of the facts of his post-crime encounter with police, admission to UNI, and police interview during his time at UNI. (*Id.*) His version tends to highlight different aspects of the suppression-hearing testimony than those recited by the state courts. For instance, where the court of appeals describes his initial police encounter as follows: "Shortly after [the crimes], police officers arrived at the house and took Reigelsperger into custody, not under suspicion of committing a crime, but based on the risk that he was 'going to harm himself or someone else,'" *Reigelsperger*, at ¶ 11, Petitioner describes it this way: "[S]everal officers dr[e]w their weapons on Petitioner, [took] him out of the house at gunpoint, handcuff[ed], search[ed] and secure[d] him, and took him into custody, (ECF No. 12, at 109-10 (citing "Tr 451:71-76 (Park City officer Jed Hurst's testimony)). However, the cited testimony does not support the characterization that weapons were drawn and he was removed from the house at gunpoint.

And, where the court of appeals states that Petitioner "was taken in an ambulance to a nearby hospital, *Reigelsperger*, at 11, Petitioner describes officers "forcibly" placing him "into an ambulance," (ECF 12, at 110 (citing "Tr 451:71-73 (Hurst's testimony))). Again, the

---

surrounding the interrogation.'" *Howes v. Fields,* 565 U.S. 499, 509 (2012) (emphasis added) (quoting *Thompson,* 516 U.S. at 112; *Stansbury v. California,* 511 U.S. 318, 325 (1994) (per curiam); *cf. Berkemer,* 468 U.S. at 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time.' [T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. . . . [An objective test does not] 'place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.'" (quoting *People v. P.*, 233 N.E.2d 255, 260 (N.Y. 1967))).

characterization of "forcibly" is not supported by the testimony, though that may be Petitioner's subjective perspective of the situation.

Many of Petitioner's factual depictions largely track the state courts' findings. For instance, he says that the interviewing officers "went to UNI . . . [to] obtain[] his DNA" and to "arrest" him, and Detective Ford "was in daily contact with UNI staff for status updates, making it clear that she was to be notified before petitioner was discharged." (*id.* at 110 (citing Tr 451: 78, 81, 92-93). He did emphasize that "UNI staff told Ford that petitioner was 'pretty bad off,'" (*id.* at 111 (citing Tr 451:108 (testimony of Detective Ford)). According to her testimony, that was stated by a nurse "probably the first day, maybe the second day he was down there." (ECF No. 5-4, at 164.) But, if the description "pretty bad off" regarded his mental state, as Petitioner intimates, his mental state was not part of the "in custody" analysis (as set forth later) and so is irrelevant here. Though, as an aside, the description of his mental or physical state is not otherwise helpful, as it was not specific and was secondhand information from an unnamed person with unknown credentials without citation to any record. And the description given the first or second day of Petitioner's stay at UNI does not speak to his condition on the day of the interview, which was "five days after [Petitioner] was taken to [UNI]," (ECF No. 5-4, at 194).

Petitioner also states that when the interviewing officers showed up at UNI, "UNI did not want to release petitioner (because petitioner was not in his right mind)." (ECF No. 12, at 111 (citing Tr 451:93-94).) He further says, "The door was locked behind petitioner and he was not free to leave or end the encounter." (*Id.* at 112.) But the testimony Petitioner cites to support the former statement does not at all support the statement--i.e., there is nothing saying UNI did not want to release Petitioner and nothing about Petitioner not being "in his right mind." And the latter statement is not supported by a citation to testimony or evidence.

So, Petitioner's attack on the state courts' factual findings boils down to (1) parroting those factual findings, based on the testimonial evidence from the suppression hearing; and (2) embellishing certain parts of the factual narrative with more aggressive chracterization that is unsupported by the evidence. Lacking the force of clear and convincing evidence otherwise, Petitioner's attack thus does not rebut the presumption of correctness given the state courts' factual findings. See 28 U.S.C.S. § 2254(e)(1) (2022). Nor has he shown "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See id.* § 2254(d)(2). The state court's factual findings thus withstand federal habeas review.

**b. Challenge to Utah Court of Appeals's legal analysis and conclusions.**

After challenging the Court of Appeals's factual findings, Petitioner challenges the state court's determination of the law relevant to its ultimate conclusion that he was not "in custody" under *Miranda*. (ECF No. 12, at 106.)

**i. Utah Court of Appeals' legal analysis and conclusions.**

In evaluating the law underlying its conclusion that Petitioner was not "in custody" under *Miranda*, the Utah Court of Appeals wrote in pertinent part:

> Reigelsperger asserts that the trial court erroneously denied his motion to suppress the statements he made during his interview at UNI. He argues that the statements resulted from custodial interrogation and were given following an inadequate *Miranda* warning.
>
> Under the Fifth Amendment to the United States Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment incorporates this constitutional protection and applies it to the states, including the procedural safeguards initially set forth in *Miranda,* 384 U.S. at 436, which require that certain warnings be given prior to custodial interrogation if the resulting evidence is to "be used against [the accused]." *Id.* at 463-67, 478-79; *accord Dickerson v. United States*, 530 U.S. 428, 432, 434-35 (2000). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury*, 511 U.S. at 322.

In *Miranda* the Supreme Court examined the pressures on individuals cut off from family, friends, and familiarity and subjected to interrogation by officers practicing psychological manipulation. 384 U.S. at 442-58. The cases before the Court involved "incommunicado interrogation . . . in a police-dominated atmosphere," which resulted in incriminating statements made "without full warnings of constitutional rights." *Id.* at 445. Noting that the compelling nature of such an environment may prompt statements that do not reflect an individual's "independent decision" to speak, *id.* at 465, the Court held that the constitutional protection against self-incrimination applies to coercive situations in which persons are "questioned while in custody or otherwise deprived of [their] freedom of action in any significant way," *id.* at 445, 467.

In the half-century following *Miranda*, the Supreme Court has refined its analysis with regard to the coercion and "in custody or otherwise deprived of . . . freedom" aspects of its decision. *See, e.g., Howes*, 565 U.S. at 508-17; *J.D.B. v. North Carolina*, 564 U.S. 261, 268-81 (2011); *Yarborough*, 541 U.S. at 660-69. As interpreted, *Miranda* applies only when "there has been such a restriction on a person's freedom as to render him 'in custody,'" *Mathiason*, 429 U.S. at 495, and "custody" is not synonymous with supervision or control but is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion," *Howes*, 565 U.S. at 508-09.

Thus, while every "'interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime,'" that baseline level of compulsion does not trigger the requirement of a *Miranda* warning. *See State v. Mirquet*, 914 P.2d 1144, 1148 (Utah 1996) (quoting *Mathiason*, 429 U.S. at 495). In addition, being temporarily detained or even incarcerated at the time of questioning does not necessarily mean that a person must be apprised of his or her *Miranda* rights prior to questioning. *See Howes*, 565 U.S. at 512 ("Service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody."); *Berkemer*, 468 U.S. at 440 ("[P]ersons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*."). An individual's freedom of movement must be sufficiently curtailed, and sufficient coercive pressure must exist, to render a person in custody for *Miranda* purposes. *See Howes*, 565 U.S. at 508-09.

When determining "whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person

would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (brackets, citations, and internal quotation marks omitted). "[H]ow a suspect would have gauge[d] his freedom of movement" is determined by examining "all of the circumstances surrounding the interrogation." *Id.* (second alteration in original) (citation and internal quotation marks omitted). Because the inquiry is an objective one, it does not turn on the "actual mindset" or "idiosyncrasies of [the] individual suspect" or on the "subjective views harbored by . . . the interrogating officers or the person being questioned." *J.D.B.*, 564 U.S. at 271 (citations and internal quotation marks omitted); *accord Stansbury*, 511 U.S. at 323. If the court concludes that the person's freedom of movement was sufficiently curtailed, the court then asks "whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

Over thirty years ago, the Utah Supreme Court identified four factors (the *Carner* factors) "that inform this analysis: (1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *State v. Fuller*, 2014 UT 29, ¶ 44 (citation and internal quotation marks omitted). More recently, the United States Supreme Court noted several factors it has considered relevant to the custody analysis, which largely overlap those identified in *Salt Lake City v. Carner*, 664 P.2d 1168 (Utah 1983): the location and duration of the questioning, the statements made during the interview, the presence or absence of physical restraints, and whether the interviewee was released at the end of the questioning. *Howes*, 565 U.S. at 509.

These factors guide our analysis, in the context of the Supreme Court's refusal to "demarcate a limited set of relevant circumstances" that control the inquiry and to instead "require[] police officers and courts to examine all of the circumstances surrounding the interrogation." *J.D.B.*, 564 U.S. at 270-71 (citation and internal quotation marks omitted); *see also State v. Maestas*, 2012 UT App 53, ¶ 50 (stating that while the *Carner* factors "aid" in the custody analysis, "[n]o one factor is dispositive," and the custody determination depends on "the totality of the circumstances"). We thus consider the *Carner* factors, as well as any additional factors indicated by the Supreme Court, within the broader contextual picture in determining whether the environment was "coercive enough to be custodial." *Cf. United States v. Pelletier*, 700 F.3d 1109, 1115 (7th Cir. 2012). And when, as a background matter, a person is subject to extensive, state-imposed restrictions on freedom of movement, the custody analysis should address "all of the features of the interrogation," including "the

manner in which the interrogation [was] conducted." *Cf. Howes*, 565 U.S. at 514 (addressing custody issue under circumstances involving questioning of person serving term of imprisonment).

We note that the record is somewhat unclear with regard to Reigelsperger's status at UNI at the time his statements were made. Initially, Reigelsperger was taken by ambulance to a nearby hospital, where he was involuntarily admitted. Reigelsperger was subsequently transferred to UNI, but the record is silent as to the timing and process of that transfer and the conditions of Reigelsperger's stay, including whether he remained there involuntarily.

The parties do not address these questions, and they are not dispositive. For purposes of our analysis, we view Reigelsperger's status at UNI in the light most supportive of his claim that he was in custody for *Miranda* purposes. We therefore assume that, at the time his statements were made, Reigelsperger was subject to the extensive curtailment of freedom of action that is consistent with involuntary commitment for mental health treatment. We also assume that those restraints were State-imposed, emanating not simply from the provision of treatment but from the State's power to confine an individual to a treatment facility. Even with the benefit of these assumptions, however, Reigelsperger's challenge fails, for he was not in custody for *Miranda* purposes when he spoke with the detectives at UNI.

Reigelsperger asserts that the police involvement in his admission to the hospital and the detectives' attempts to monitor his status thereafter demonstrate that he was in *Miranda* custody, particularly when viewed in combination with the other circumstances attendant to his questioning. Reigelsperger first challenges the trial court's findings (and several subsidiary findings) that the police detectives did not effectively oversee his stay at UNI and that he was not in their custody prior to the interview. Reigelsperger claims the detectives were in "complete control" of his situation because, among other things, the detectives expected to know of his release in advance and an officer was stationed at the hospital until "it was determined that [Reigelsperger] would not be released except to law enforcement." (Internal quotation marks omitted.)

But Reigelsperger has not adequately supported these claims. Reigelsperger's last assertion lacks any supporting citation to evidence and does not appear to be borne out by the record. In addition, Reigelsperger does not marshal, counter, or even address the main evidence in support of the trial court's finding that he was not in police custody prior to the interview--specifically, the lack of police oversight of Reigelsperger's treatment; the obstacles the detectives faced in obtaining information from UNI; UNI's

reluctance to allow the detectives to meet with Reigelsperger or even to acknowledge his presence there; and Detective's statements that while she "hope[d]" UNI would alert her before releasing Reigelsperger, she did not know whether that would occur. If a party fails to marshal the evidence in support of a challenged finding, the party "will almost certainly fail to carry its burden of persuasion on appeal," *State v. Nielsen*, 2014 UT 10, ¶ 42, and Reigelsperger has not shown the trial court's findings to be clearly erroneous.

Reigelsperger nevertheless relies on language from a Ninth Circuit Court of Appeals opinion, which suggests that if police "'took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or [engaged in] some combination of these'" actions, the suspect could be in custody for *Miranda* purposes. (Quoting *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985).) Reigelsperger portrays his situation as a continuous period of police oversight and restraint, beginning with his being taken to the hospital and ending with his arrest at UNI, and argues that his case is sufficiently analogous to the Ninth Circuit's hypothetical situation to constitute custody. We disagree.

Reigelsperger *was* taken by police to the hospital, but not as a suspect. To the extent his freedom of movement was subsequently constrained as a general matter, it was due to his involuntary commitment for mental health treatment--not due to his potential culpability for conduct toward Wife. And as set forth below, those general constraints, coupled with any additional restraints or pressures resulting from the detectives' investigation, were not sufficiently restrictive and coercive to render Reigelsperger in custody for purposes of *Miranda*.

On the day of the interview, Reigelsperger was escorted by "medical personnel" from his present location at UNI to "a large . . . waiting area" where he sat down on a couch between the two chairs in which the detectives were waiting. With regard to the location itself, Reigelsperger's transfer to the waiting area did not involve the "shock that very often accompanies arrest" when a person is "whisked [away]" from his normal surroundings to a "police-dominated atmosphere." *Cf. Howes*, 565 U.S. at 511 (citation and internal quotation marks omitted). Reigelsperger also had no reason to believe that the answers he provided to the detectives' questions might result in his being released and allowed to go home. *Cf. id.* (noting concern that individual "arrested and taken to a station house for interrogation" might be "lured into speaking by a longing for prompt release"). The waiting area at UNI was thus not so restrictive and coercive as to constitute a per

se custodial situation. *Cf. id.* at 511-12 (concluding that when person is questioned on prison grounds, while serving term of imprisonment, those circumstances are not alone dispositive of whether person is in custody for *Miranda* purposes).

Any additional restraints or pressures resulting from the detectives' presence did not render the environment a custodial one. On the one hand, Reigelsperger was not released at the conclusion of the interview; he was arrested as the detectives had previously planned. Moreover, Reigelsperger likely would have surmised that he was a suspect under investigation. He had recently left a message for Wife apologizing for "intruding on [her] sexuality"; the detectives had just requested a DNA sample; the detectives advised Reigelsperger that he had the right to remain silent, his words could be used against him in court, and he had the right to an attorney; and the detectives' questions focused on the day in question and the events leading up to it. But while these factors favor a finding of *Miranda* custody, they are not determinative here.

Status as a suspect does not necessarily impose a warning requirement. "[S]ome suspects are free to come and go until the police decide to make an arrest," and a detective's beliefs concerning an individual's potential culpability are relevant only to the extent they would "affect[] how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury*, 511 U.S. at 325. Thus, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive." *Id.* And suspects have been questioned in many circumstances not amounting to custody. *See, e.g., Howes*, 565 U.S. at 502-03, 517 (concluding defendant questioned while serving jail sentence, regarding conduct that allegedly occurred before imprisonment, was not in custody despite being confronted with allegations of criminal conduct by two armed deputies during five-to-seven hour interrogation in conference room of jail facility); *Berkemer*, 468 U.S. at 423, 441-42 (concluding driver of motor vehicle was not in custody when stopped and questioned, despite state trooper's prior conclusion that driver would be arrested and charged with traffic offense); *Mathiason*, 429 U.S. at 494-95 (concluding individual suspected of theft and interviewed at patrol office was not in custody).

In addition, the detectives' intent to arrest Reigelsperger had not been communicated to him, and he demonstrated no awareness that his stay at UNI would end momentarily with his apprehension. An unarticulated plan to arrest a suspect has no bearing on whether a suspect is "in custody at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position

would have understood his situation." *Berkemer*, 468 U.S. at 442 (internal quotation marks omitted).

Other characteristics of the interview also suggest Reigelsperger was not in *Miranda* custody. Although Reigelsperger was not told that he could leave, he appeared "rather eager to tell his side of the story," the recorded interview was completed in less than thirty minutes, and there is no evidence that the detectives engaged in coercive tactics. In addition, the detectives were not numerous, they were not in full uniform, and they were unarmed, carrying only a pair of handcuffs. Moreover, Reigelsperger was not restricted by medical equipment, by the detectives, or by UNI staff, and while Reigelsperger may not have been "free to leave the [waiting area] by himself" given his status as a patient in the facility, *cf. Howes*, 565 U.S. at 515, neither the room nor its location generated a palpable impression that the detectives, rather than Reigelsperger, would control when the interview would end.

Taking into account all of the attendant circumstances, a reasonable person in Reigelsperger's situation would have felt he or she was "at liberty to terminate the interrogation," *see id.* at 509 (citation and internal quotation marks omitted), even if he or she did not feel free to leave the facility or to leave the room without the permission and escort of a facility staff member, *see id.* at 515-17 (concluding prisoner who was "not free to leave the conference room by himself and to make his own way through the facility to his cell" was not in custody for *Miranda* purposes); *State v. Butt*, 2012 UT 34, ¶¶ 21-22 (concluding person interviewed in jail cell was not in custody for *Miranda* purposes, though person in those circumstances would "not feel 'free to leave'"). In addition, the environment did not "present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Howes*, 565 U.S. at 509. We therefore conclude, given the totality of the circumstances, that Reigelsperger was not in custody and thus was not entitled to a *Miranda* warning, and the trial court did not err in denying his motion to suppress on that basis. *Cf. Butt*, 2012 UT 34, ¶ 22 (concluding suspect interviewed in jail cell was not in custody, where he "was not restrained beyond his usual status as a jail inmate, nor was he coerced in any way").

*Reigelsperger*, at ¶¶ 40-59 (footnotes omitted).

The court of appeals based its decision that *Miranda*'s tenets were not violated on its conclusion that Petitioner was not in custody for *Miranda* purposes and therefore *Miranda*'s prophylactic measures did not apply to police questioning of Petitioner in the hospital. Any of

Petitioner's arguments based on other aspects of the police interview (e.g., the inadequacy of the attempted *Miranda* warning) are thus disregarded as irrelevant to the court of appeals's analysis.

Petitioner agrees that *Howes* and *J.D.B.* are cases applicable to the determination of whether a person is "in custody" under *Miranda*. (ECF No. 12, at 116-17.) But he argues that the state court applied the wrong factors "for determining that petitioner was not in custody during the custodial interrogation which occurred at the UNI critical psychiatric facility." (*Id.* at 117-18.) Interestingly, Petitioner criticizes the Utah Court of Appeals's selection of the factors for determining his custody status and the state cases applied by the court, yet the factors and caselaw mirror those found in Petitioner's appellate brief before the court. (ECF No. 5-3, at 19-32.) Indeed, the state-law factors--cited by the court of appeals--to be considered in analyzing whether a defendant may be determined to be "in custody" under *Miranda* are the exact ones used in Petitioner's appellate brief. (*Id.* (citing *Maestas*, 272 P.3d at 784; *Mirquet*, 914 P.2d at 1147); *Carner*, 664 P.2d at 1170-71).)

The court of appeals further correctly noted these factors "guide," not *control* the inquiry, which considers all "the circumstances surrounding the interrogation." *Reigelsperger*, at ¶ 47 (quoting *J.D.B.*, 564 U.S. at 270-71 (citation and internal quotation marks omitted); citing *Maestas*, 2012 UT App 53, at ¶ 50 (stating while *Carner* factors "aid" in custody analysis, "[n]o one factor is dispositive," and custody determination depends on "totality of the circumstances"). The court of appeals also ensured that "additional factors indicated by the Supreme Court" were part of the analysis of "the broader contextual picture in determining whether the environment was 'coercive enough to be custodial.'" *Id.* (citing *Pelletier*, 700 F.3d at 1115).

In sum, to analyze this *Miranda* issue, the Utah Court of Appeals selected the exact framework urged by Petitioner's appellate brief, and added the United States Supreme Court law

urged by Petitioner's arguments before this Court. (ECF Nos. 1, 5-3, 12.) Petitioner is therefore in no position to request his conviction be overturned on the ground of the court of appeals's application of incorrect legal principles. He specifically asked the court of appeals to apply state-law factors, though those factors were only part of its analysis clearly highlighting the Supreme Court's precedent stemming from *Miranda*. (ECF No. 5-3); *Reigelsperger*, at ¶¶ 40-59.

Still, Petitioner goes on to argue here that "[e]ven under the state standard, Petitioner was in custody." (ECF No. 12, at 118.) But, that cannot be a valid argument here, in which the only possible real question is the reasonable application of federal standards clearly established by the United States Supreme Court.

**ii. Utah Court of Appeals did not unreasonably apply clearly established federal law.**

Following *Carey*, 549 U.S. at 70, the first step of analysis is to decide whether clearly established federal law governs Petitioner's claims. *Yarborough,* 541 U.S. at 660; *House*, 527 F.3d at 1017-18; *see also Littlejohn*, 704 F.3d at 825. The answer to that "threshold question" here is clearly yes: *Miranda*, 384 U.S. at 436, and its progeny. The Court therefore goes on to ask the next question of "whether the state court decision is either contrary to or an unreasonable application of such law." *House*, 527 F.3d at 1018.

So, the Court now considers (under the presumed facts) whether Petitioner has shown that the Utah Court of Appeals's ruling that he was not in custody, for *Miranda* purposes, "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. And the clear answer is that he has not.

In the twenty detailed paragraphs that the court of appeals devoted to this issue, it started with the venerable lead case on this issue, *Miranda*, 384 U.S. at 436, and cited seven United States Supreme Court opinions that flowed from it:

- *Mathiason*, 429 U.S. at 492;
- *Dickerson,* 530 U.S. at 428;
- *Stansbury,* 511 U.S. at 318, paying particular attention to the Supreme Court's refinement of its analysis about coercion and the "in custody or otherwise deprived of . . . freedom" aspects of its *Miranda* jurisprudence, *see Howes,* 565 U.S. at 499;
- *J.D.B.*, 564 U.S. at 261;
- *Yarborough*, 541 U.S. at 652; and
- *Berkemer*, 468 U.S. at 420. *Reigelsperger*, at ¶¶ 41-45.

The court then explained how the state law it applied dovetailed with federal constitutional law on this subject. *Id.* at ¶¶ 46-47 (citing *State v. Fuller*, 2014 UT 29, ¶ 44 (citing *Miranda*, 384 U.S. at 436); *Salt Lake City v. Carner*, 664 P.2d 1168 (Utah 1983) (citing *Miranda*, 384 U.S. at 436); *Maestas*, 2012 UT App 53, ¶¶ 49-50 (citing *Stansbury*, 511 U.S. at 323; *Berkemer*, 468 U.S. at 440)). The court went on to carefully apply this law to the facts of the case (presumed correct on this federal habeas review), giving Petitioner the benefit of the doubt when possible:

> For purposes of our analysis, we view Reigelsperger's status at UNI in the light most supportive of his claim that he was in custody for *Miranda* purposes. We therefore assume that, at the time his statements were made, Reigelsperger was subject to the extensive curtailment of freedom of action that is consistent with involuntary commitment for mental health treatment. We also assume that those restraints were State-imposed, emanating not simply from the provision of treatment but from the State's power to confine an individual to a treatment facility.

*Id.* at ¶ 49.

Petitioner attempts to carry his burden of challenging the court of appeals's thorough parsing of the facts together with applicable legal tenets from Supreme Court decisions is to merely cite several Supreme Court cases, while flatly contending that the "totality of circumstances" of the interrogation "violated fundamental fairness and negated Petitioner's ability to make a knowing, intelligent, and voluntary decision to waive his right to remain silent and his right to counsel." (ECF Nos. 1, at 25 (citing *Fulminante*, 499 U.S. at 295-96; *Connelly*,

479 U.S. 157; *Brewer*, 430 U.S. 387; *Miranda*, 384 U.S. at 436); 12, at 108, 115 (citing *J.D.B.*, 564 U.S. at 278-80; *Wiggins*, 539 U.S. at 528; *Dickerson*, 530 U.S. at 443-44; *Berkemer v. McCarty*, 468 U.S. 420, 444 (1984); *Townsend v. Sain*, 372 U.S. 293, 308 (1963); *Johnson v. Zerbst*, 304 U.S. 458 (1938).)

Still, to be cautious because Petitioner proceeds *pro se*, the Court assessed in turn each of these ten Supreme Court cases, concluding the first three cited in his Petition, (ECF No. 1, at 25), are inapplicable to the current case, involving the sole question of whether Petitioner was "in custody," under *Miranda*. *Fulminante*, 499 U.S. at 302 (holding defendant's confession coerced and its admission at trial "not harmless beyond a reasonable doubt"); *Connell*y, 479 U.S. at 167-68 (holding coercive police activity necessary predicate to finding confession not "voluntary" under Due Process Clause, and State need only show waiver of *Miranda* by preponderance of evidence); *Brewer*, 430 U.S. at 397-98 (stating no need to review case under *Miranda* when ground upon which case should be decided was right to assistance of counsel).

As for Petitioner citing *Miranda*, 384 U.S. at 444 (holding "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination"), of course *Miranda* set forth the seminal principles guiding the analysis here, as showcased above. However, the facts of the four cases at issue in *Miranda* were not close enough to the current facts to demand a result opposite of the one reached by the Utah Court of Appeals. *Id.* at 491-99 (reviewing sets of facts not including issue of whether each defendant was deemed "in custody"). And Petitioner has not argued at all, let alone carried his burden of showing, that the court of appeals's decision that he was not "in custody," under the facts and holdings at issue in *Miranda* and its United States Supreme Court progeny, "was so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Moving on to the Supreme Court cases cited in Petitioner's Reply Brief, (ECF No. 12, at 108, 115), the Court (above in footnote eight) already described *J.D.B.* and *Wiggins* as factually dissimilar United States Supreme Court cases cited to support basic legal tenets--e.g., regarding the "in custody" determination. They do not carry Petitioner's burden to show that the Utah Court of Appeals unreasonably applied on-point United States Supreme Court precedent. *See J.D.B.*, 131 S. Ct. at 2407 (holding "child's age properly informs the *Miranda* custody analysis"); *Wiggins*, 539 U.S. at 528-29 (ineffective-assistance-of-counsel case).

Likewise, none of the remaining Supreme Court cases cited by Petitioner are the kind of factually "closely-related" cases in which "the Supreme Court . . . expressly extended [its] legal rule to that context." *House*, 527 F.3d at 1016. Indeed, *Dickerson*, 530 U.S. at 428, while addressing *Miranda*-related issues, did not treat the question of whether the accused was "in custody"; and the Utah Court of Appeals cited *Dickerson* only for the general proposition that the procedural safeguards initially set forth in *Miranda*, 384 U.S. at 436, require certain warnings to be given prior to custodial interrogation if the resulting evidence is to "be used against [the accused]." *Reigelsperger*, at ¶ 41 (citing *Dickerson v. United States*, 530 U.S. at 432, 434-35).

Meanwhile, *Berkemer*, 468 U.S. at 420, regards facts of the accused's statements at a traffic stop, which is disparate from this case. The Utah Court of Appeals cited that case only as an example of when suspects have been questioned in scenarios not amounting to custody and of the principle that "an unarticulated plan to arrest a suspect has no bearing on whether a suspect is in custody at a particular time; the only relevant inquiry is how a reasonable [person] in the

suspect's position would have understood his situation." *Reigelsperger*, at ¶¶ 44, 56-57 (quoting *Berkemer*, 468 U.S. at 423, 441-42 (internal quotation marks omitted)).

Finally, neither *Townsend*, 372 U.S. at 293, nor *Johnson*, 304 U.S. at 458, address *Miranda*-related issues at all, let alone involve the question if the accused was "in custody." The Utah Court of Appeals did not even cite *Townsend*. *See Reigelsperger*, 2017 UT App 101.

After a thorough review of all Petitioner's arguments and case citations, it remains unclear why Petitioner cited any of these cases to support his arguments that the Utah Court of Appeals unreasonably applied United States Supreme Court precedent to the facts of his case.

### iii. Summary.

Though Petitioner has continued to argue through the state and federal courts that the state trial court should have suppressed his statements from what he deems an unconstitutional custodial interrogation, (ECF No. 1, at 13), Petitioner has not carried his burden, under the federal habeas standard of review. He was required to show that the Utah Court of Appeals's analysis of his argument "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.S. § 2254(d)(1) (2022).

"[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125. The Utah Court of Appeals's determinations of facts and law were not unreasonable and led it to conclude that Petitioner was not "in custody," because he was neither formally arrested, nor were his movements restrained like unto a formal arrest, *id.*[15] Thus, the state courts' decision that

---

[15] Petitioner argues, "This case does not present a run-of-the-mill *Miranda* question, but involves the determination of custody status of a patient in a psychiatric facility under the inherent vulnerability and mental status of a patient in such a facility." (ECF No. 12, at 107.) But he has not cited a case showing that the in-custody inquiry is principally keyed to the vulnerability and mental status of a psychiatric-facility patient, instead of to the

Petitioner's interview responses could be used as evidence at trial is unassailable under the federal habeas standard of review. So, like his other arguments in this federal habeas case, Petitioner's *Miranda* challenge does not provide Petitioner a basis for habeas relief.[16]

## IV. CONCLUSION

Petitioner's claims do not overcome the federal habeas standard of review.

## ORDER

**IT IS THEREFORE ORDERED** that:

**(1)** The petition for writ of habeas corpus is **DENIED** and the action **DISMISSED WITH PREJUDICE**.

**(2)** A certificate of appealability is **DENIED**.

**(3)** This action is **CLOSED**.

DATED this 19th of September, 2022.

BY THE COURT:

_____
DAVID NUFFER, United States District Judge

---

interviewee's arrest status--i.e., was the interviewee arrested, or was his movement restrained similarly to formal arrest? And the Utah Court of Appeals recognized that critical distinction here: "Reigelsperger was subject to the extensive curtailment of freedom of action that is consistent with involuntary commitment for mental health treatment." *Reigelsperger*, at ¶ 49. The implication is that such an involuntary commitment does not result in the same kind of constraint and vulnerability that exists with a formal arrest. And, again, Petitioner does not cite a Supreme Court case requiring a different perspective.

[16] In its analysis, the court of appeals also noted that Petitioner's argument "relie[d] on the language from a Ninth Circuit Court of Appeals opinion," *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (suggesting suspect could be in custody for *Miranda* purposes when police "took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or [engaged in] some combination of these" actions). *Id.* at ¶ 52. While the court thoroughly rejected Petitioner's argument that his case was analogous, *id.* at ¶¶ 52-53, the most important thing to remember here is that the applicability of a Ninth Circuit case is not relevant on federal habeas review. *See* 28 U.S.C.S. § 2254(d)(1) (2022) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .").